# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

ATTORNEY
FOR THE S.D.N.Y.

SEP 30 2022

1335 HRS

| | | |
|---|---|---|
| ANTHONY J. FUTIA, Jr,. | ) | |
| Plaintiff | ) | **MOTION FOR RECONSIDERATION** |
| v. | ) | |
| UNITED STATES | ) | Case No. 22-cv-6965 |
| Defendant | ) | Hon. Kenneth M. Karas |

PRO SE OFFICE

RECEIVED
SEP 30 2022

## MOTION FOR RECONSIDERATION

Plaintiff Anthony J. Futia, Jr., ("Futia") respectfully requests reconsideration of the Court's August 30, 2022 ORDER denying without prejudice his August 15, 2022 motion for preliminary injunctive relief.

In its ORDER of August 30, 2022, the Court correctly held, "Plaintiff appears to allege that Defendant violated his constitutional rights when it required him to pay federal income taxes without responding to his petitions for redress. (*See generally* Compl (Dkt. No. 1).).".

However, Plaintiff Futia respectfully requests of the Court that it reconsider what it then held, namely, "Plaintiff's First Amendment arguments regarding the government's obligation to respond to his petition(s) for redress prior to paying his taxes have already been heard and entirely denied by then-Judge Kavanaugh. *See*

1

*enerally, We The People Foundation v. United States*, 485 F.3d 140 (D.C. Cir. 2007). The Court sees no fault in then-Judge Kavanaugh's reasoning."

Respectfully, not only is this Court generally not obligated to follow a ruling by the D.C. Circuit, to defer to said *We The People v. United States* ruling would be a miscarriage of justice, adding up to a faithless, disloyal, treasonous judicial repeal of the petition clause.[1]

In its ruling in *We The People Foundation v. United States*, 485 F.3d 140 (D.C. Cir. 2007) ("*We The People*") the Court deferred to rulings in the inapplicable cases *Smith v. Arkansas State Highway Employees* 441 U.S. 463 (1979) ("*Smith*") and *Minnesota State Board for Community Colleges v. Knight* 465 U.S. 271 (1984) ("*Knight*") while admitting it was not going to resolve the readily apparent conflict presented by Plaintiffs-Appellants' "historical record" argument.

Thus, the ruling in *We The People* did not conform with fact and truth as demonstrated by the historical record of the Right to Petition, the opinions by judges Kavanaugh and Rodgers, and the holdings in *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011).

---

[1] Futia, a founder and Director of the We The People Foundation For Constitutional Education, Inc., was one of the 1450 petitioners-appellants in *We The People v United States,* 485 F3d 140 (DC Cir. 2007).

### The Ruling In *We The People Foundation V. United States* Did Not Conform With Fact and Truth as Demonstrated By The Historical Record of The Right To Petition

A thorough review of the historical record of the Petition Clause of the First Amendment was before the *We The People* Court in a document entitled, "HISTORICAL RECORD OF THE RIGHT TO PETITION GOVERNMENT FOR REDRESS OF GRIEVANCES." The document was based on a review of dozens of historical documents and scholarly works. Both the historical record and the extensive list of references were included in the record before the Court..

In *We The People*, consistent with the direction later given by the Supreme Court in *Heller* and *Guarnieri* (see below), Plaintiffs rested their Petition Clause claim on the Historical Review of the origin, scope, purpose and line of growth of the Right to Petition, from the 1215 English Magna Carta to its addition to the U.S. Constitution's Bill of Rights in 1791, through the "Gag Rule" of 1836-1844 and beyond. **Clearly evident is the Right of the People to a meaningful response to a proper Petition for Redress, especially for redress of governmental oppressions such as its violations of the Constitution and laws pursuant thereto.**

The remainder of this section of this motion is from said historical record.

Chapter 61 of the Magna Carta of 1215 reads in part:

" 61. Since, moreover, for God and the amendment of our kingdom and for the better allaying of the quarrel that has arisen between us

3

and our barons, we have granted all these concessions, desirous that they should enjoy them in complete and firm endurance forever, we give and grant to them the underwritten security namely, that the barons choose five and twenty barons of the kingdom, whomsoever they will, who shall be bound with all their might, to observe and hold, and cause to be observed, the peace and liberties we have granted and confirmed to them by this our present Charter, so that if we, or our justiciar, or our bailiffs or any one of our officers, shall in anything be at fault towards anyone, or shall have broken any one of the articles of this peace or of this security, and the offense be notified to four barons of the foresaid five and twenty, the said four barons shall repair to us (or our justiciar, if we are out of the realm) **and, laying the transgression before us, petition to have that transgression redressed without delay. And if we shall not have corrected the transgression (or, in the event of our being out of the realm, if our justiciar shall not have corrected it) within forty days, reckoning from the time it has been intimated to us (or to our justiciar, if we should be out of the realm), the four barons aforesaid shall refer that matter to the rest of the five and twenty barons, and those five and twenty barons shall, together with the community of the whole realm, distrain and distress us in all possible ways, namely, by seizing our castles, lands, possessions, and in any other way they can, until redress has been obtained as they deem fit,** saving harmless our own person, and the persons of our queen and children; and **when redress has been obtained, they shall resume their old relations towards us....**" (emphasis added by Plaintiffs).

Chapter 61 was thus a procedural vehicle for enforcing the rest of the Charter. It spells out the Rights of the People and the obligations of the Government, and the procedural steps to be taken by the People and the King in the event of a violation by the King of any provision of that Charter: the People were to transmit a Petition for a Redress of their Grievances; the King had 40 days to respond; **if the King**

**failed to respond, the People could enforce their Rights** or violence could be legally employed against the King until he Redressed the alleged Grievances.[2]

The First Amendment of our Bill of Rights, prohibiting laws "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" was also rooted in the 1689 English Declaration of Rights which proclaimed in part, "[I]t is the Right of the subjects to petition the King, and all commitments and prosecutions for such petitioning is illegal."

**In 1774, the Congress that later adopted the Declaration of Independence (including delegates George Washington, John and Samuel Adams, Roger Sherman, Patrick Henry and John Jay and dozens of others) unanimously adopted an Act in which they gave meaning to the People's Right to Petition for Redress of Grievances and the Right of enforcement as they spoke about the People's "Great Rights." Quoting:**

> **"If money is wanted by rulers who have in any manner oppressed the People, they may retain it until their grievances are redressed, and thus peaceably procure relief, without trusting to despised petitions or disturbing the public tranquility."[3]**

---

[2] Magna Carta, Chapter 61. See also William Sharp McKechnie, Magna Carta, 468-77 (2nd ed. 1914).

[3] "Continental Congress To The Inhabitants Of The Province of Quebec." Journals of the Continental Congress 1774. Journals 1:105-13.

In 1775, prior to drafting the Declaration of Independence, Thomas

Jefferson, as a delegate to the Continental Congress, gave further meaning to the

People's Right to Petition for Redress of Grievances and the Right of enforcement.

Quoting:

> **"The privilege of giving or withholding our moneys is an important barrier against the undue exertion of prerogative which if left altogether without control may be exercised to our great oppression; and all history shows how efficacious its intercession for redress of grievances and reestablishment of rights, an how improvident would be the surrender of so powerful a mediator."[4]**

In 1776, the Declaration of Independence was adopted by the Continental

Congress (five months after the publication and extraordinarily popular pamphlet,

"Common Sense" by Thomas Paine which pointed to the fact that the colonists had

been recklessly petitioning for redress of their grievances for years without results,

and were in need of a manifesto which spoke to the futility of the approach, which

would do more good than "a boatload of petitions" heading to England).  The bulk

of the Declaration of Independence is a listing of 27 grievances the People had

against the Government that had been ruling the colonies for 150 years. The final

grievance on the list is referred to by scholars as the **"capstone grievance,"** the

grievance that prevented Redress of the other Grievances, the grievance that finally

caused the People to withdraw their support and allegiance to the Government, and

---

[4] Thomas Jefferson: Reply to Lord North, 1775. Papers 1:225.

that eventually justified War against the King, morally and legally. Quoting the so-called **capstone grievance**:

> "**In every stage of these Oppressions We have Petitioned for Redress in the most humble terms. Our repeated Petitions have been answered only by with repeated injury. A Prince, whose character is thus marked by every act which may define a Tyrant, is thus unfit to be the ruler of a free people….We, therefore…declare, That these United Colonies…are Absolved from all Allegiance to the British Crown….**" *Declaration of Independence*, 1776.

Thus, the Continental Congress gave further meaning to the People's Right to Petition for Redress of governmental wrongdoing and the **Right of enforcement** even to the point of dismissing the government should the government fail to respond to a Petition for Redress in a meaningful way.

Though the Rights to Popular Sovereignty and its "protector" Right, the Right of Petition for Redress have become somewhat forgotten, **they took shape early on by government's response to Petitions for Redress of Grievances.**[5]

---

[5] See A SHORT HISTORY OF THE RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF GRIEVANCES, Stephen A. Higginson, 96 Yale L.J. 142(November, 1986); "SHALL MAKE NO LAW ABRIDGING . . .": AN ANALYSIS OF THE NEGLECTED, BUT NEARLY ABSOLUTE, RIGHT OF PETITION, Norman B. Smith, 54 U. Cin. L. Rev. 1153 (1986);"LIBELOUS" PETITIONS FOR REDRESS OF GRIEVANCES -- BAD HISTORIOGRAPHY MAKES WORSE LAW, Eric Schnapper, 74 Iowa L. Rev. 303 (January 1989);THE BILL OF RIGHTS AS A CONSTITUTION, Akhil Reed Amar, 100 Yale L.J. 1131 (March, 1991); NOTE: A PETITION CLAUSE ANALYSIS OF SUITS AGAINST THE GOVERNMENT: IMPLICATIONS FOR RULE 11 SANCTIONS, 106 Harv. L. Rev. 1111 (MARCH, 1993); SOVEREIGN IMMUNITY AND THE RIGHT TO PETITION: TOWARD A FIRST AMENDMENT RIGHT TO PURSUE JUDICIAL CLAIMS AGAINST THE GOVERNMENT, James E. Pfander, 91 Nw. U.L. Rev.

The Right to Petition is a distinctive, substantive Right, from which other substantive First Amendment Rights were derived. **The Rights to free speech, press and assembly originated as derivative Rights insofar as they were necessary to protect the <u>pre-existing</u> Right to Petition.** Petitioning, as a way of holding government accountable to natural Rights, first appeared in England in the 11th century[22] and gained official recognition as a Right in the mid-17[th] century.[23] Free speech Rights first developed because members of Parliament needed to discuss freely the Petitions they received.[24] Publications reporting Petitions were the first to receive protection from the frequent prosecutions against the press for seditious libel.[25] Public meetings to prepare Petitions led to recognition of the Right of Public Assembly.[26]

---

899 (Spring 1997); THE **VESTIGIAL CONSTITUTION:** THE HISTORY AND SIGNIFICANCE OF THE RIGHT TO PETITION, Gregory A. Mark, 66 Fordham L. Rev. 2153 (May, 1998); DOWNSIZING THE RIGHT TO PETITION, Gary Lawson and Guy Seidman, *93 Nw. U.L. Rev. 739* (Spring 1999); A RIGHT OF ACCESS TO COURT UNDER THE PETITION CLAUSE OF THE FIRST AMENDMENT: DEFINING THE RIGHT, Carol Rice Andrews, 60 Ohio St. L.J. 557 (1999) ; MOTIVE RESTRICTIONS ON COURT ACCESS: A FIRST AMENDMENT CHALLENGE, Carol Rice Andrews, 61 Ohio St. L.J. 665 (2000).

[22]   Norman B. Smith, "Shall Make No Law Abridging...": Analysis of the Neglected, But Nearly Absolute, Right of Petition, 54 U. CIN. L. REV. 1153, at 1154.

[23]   See Bill of Rights, 1689, 1 W & M., ch. 2 Sections 5,13 (Eng.), reprinted in 5 THE FOUNDERS' CONSITUTION 197 (Philip B. Kurland & Ralph Lerner eds., 1987); 1 WILLIAM BLACKSTONE, COMMENTARIES 138-39.

[24]   See David C. Frederick, *John Quincy Adams, Slavery, and the Disappearance of the Right to Petition*, 9 LAW & HIST. REV. 113, at 115.

[25]   See Norman B. Smith, *supra*, at 1165-67.

[26]   See Charles E. Rice, *Freedom of Petition*, in 2 ENCYCLOPEDIA OF THE AMERICAN

**The Right to Petition was widely accorded greater importance than the Rights of free expression**. For instance, in the 18th century, the House of Commons,[27] the American Colonies,[28] and the first Continental Congress[29] gave official recognition to the Right to Petition, but not to the Rights of Free Speech or of the Press.[30]

The historical record shows **the framers and ratifiers of the First Amendment also understood the Petition Right as distinct from the Rights of free expression**. In his original proposed draft of the Bill of Rights, Madison listed the Right to Petition and the Rights to free speech and press in two separate sections.[31] In addition, a "considerable majority" of Congress defeated a motion to strike the assembly provision from the First Amendment because of the understanding that all of the enumerated rights in the First Amendment were separate Rights that should be specifically protected.[32]

---

CONSTITUTION 789, (Leonard W. Levy ed., 1986)

[27] See Norman B. Smith, *supra*, at 1165.

[28] For example, Massachusetts secured the Right to Petition in its Body of Liberties in 1641, but freedom of speech and press did not appear in the official documents until the mid-1700s. See David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L. REV. 455, 463 n.47 (1983).

[29] See id. at 464 n.52.

[30] Even when England and the American colonies recognized free speech Rights, petition Rights encompassed freedom from punishment for petitioning, whereas free speech Rights extended to freedom from prior restraints. See Frederick, *supra*, at 115-16.

[31] See *New York Times Co. v. U.S.*, 403 U.S. 670, 716 n.2 (1971)(Black, J., concurring). For the full text of Madison's proposal, see 1 ANNALS OF CONG. 434 (Joseph Gales ed., 1834).

[32] See 5 Bernard Schwartz, *The Roots Of The Bill Of Rights* at 1089- 91 (1980).

**Thus, petitioning government for Redress of Grievances has played a key role in the development, exercise and enforcement of popular sovereignty throughout British and American history.**[33] In medieval England, petitioning began as a way for barons to inform the King of their concerns and to influence his actions.[34] Later, in the 17th century, Parliament gained the Right to Petition the King and to bring matters of public concern to his attention.[35] This broadening of political participation culminated in the official recognition of the **right of Petition in the People themselves.**[36]

The People used this newfound Right to **question the legality of the government's actions,**[37] **to present their views on controversial matters,**[38] and

---

[33] See Don L. Smith, *The Right to Petition for Redress of Grievances: Constitutional Development and Interpretations* 10-108 (1971) (unpublished Ph.D. dissertation) (Univ. Microforms Int'l); K. Smellie, *Right to Petition*, in 12 ENCYCLOPEDIA OF THE SOCIAL SCIENCES 98, 98-101 (R.A. Seiligman ed., 1934).

[34] The Magna Carta of 1215 guaranteed this Right. See MAGNA CARTA, ch. 61, reprinted in 5 THE FOUNDERS' CONSTITUTION, *supra* n.5, at 187.

[35] See PETITION OF RIGHT chs. 1, 7 (Eng. June 7, 1628), reprinted in 5 THE FOUNDERS' CONSTITUTION, *supra* at 187-88.

[36] In 1669, the House of Commons stated that, "it is an inherent right of every commoner in England to prepare and present Petitions to the House of Commons in case of grievances, and the House of Commons to receive the same." Resolution of the House of Commons (1669), reprinted in 5 THE FOUNDERS' CONSTITUTION, *supra* at 188-89.

[37] For example, in 1688, a group of bishops sent a petition to James II that accused him of acting illegally. See Norman B. Smith, *supra*, at 1160-62. James II's attempt to punish the bishops for this Petition led to the Glorious Revolution and to the enactment of the Bill of Rights. See Donald L. Smith, *supra* at 41-43.

[38] See Norman B. Smith, *supra* at 1165 (describing a Petition regarding contested parliamentary elections).

to demand that the government, as the creature and servant of the People, be responsive to the popular will.[39]

In the American colonies, disenfranchised groups used Petitions to seek government accountability for their concerns **and to rectify government misconduct.**[40]

By the nineteenth century, Petitioning was described as "essential to … a free government"[41] – an inherent feature of a republican democracy,[42] and one of the chief means of **enhancing government accountability through the participation of citizens.**

**This interest in Government accountability was understood to demand Government response to Petitions.**[43]

---

[39] In 1701, Daniel Defoe sent a Petition to the House of Commons that accused the House of acting illegally when it incarcerated some previous petitioners. In response to Defoe's demand for action, the House released those Petitioners. See Norman B. Smith, *supra* at 1163-64.

[40] RAYMOND BAILEY, *POPULAR INFLUENCE UPON PUBLIC POLICY: PETITIONING IN EIGHTEENTH-CENTURY VIRGINIA,* 43-44 (1979).

[41] THOMAS M. COOLEY, *TREATISE ON THE CONSTITUTIONAL  LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE  STATES OF THE AMERICAN UNION,* 531 (6th ed. 1890).

[42] See CONG. GLOBE, 39th Cong., 1st Session. 1293 (1866) (statement of Rep. Shellabarger) (declaring petitioning an indispensable Right "without which there is no citizenship" in any government); JOSEPH STORY, *COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES* 707 (Carolina Academic Press ed. 1987) (1833) (explaining that the Petition Right "results from [the] very nature of the structure [of a republican government]").

[43] See Frederick, *supra* at 114-15 (describing the historical development of the duty of government response to Petitions).

American colonists, who exercised their Right to Petition the King or Parliament,[44] expected government to receive **and respond** to their Petitions.[45]

**The King's persistent refusal to provide a meaningful response to the colonists' grievances outraged the colonists, and <u>as the grievance that capped all the others it was the most significant factor that led to the American Revolution.</u>[46]**

Frustration with the British government led the Framers to consider incorporating a people's right to "instruct their Representatives" in the First Amendment.[47] Members of the First Congress easily defeated this right-of-instruction proposal.[48] Some discretion to reject petitions that "instructed government," they reasoned, **would not undermine government accountability to the People, as long as Congress had a duty to consider petitions and fully respond to them.**[49]

---

[44] See DECLARATION AND RESOLVES OF THE CONTINENTAL CONGRESS 3 (Am. Col. Oct. 14, 1774), reprinted in 5 THE FOUNDERS' CONSTITUTION, *supra* n5 at 199; DECLARATION OF RIGHTS OF THE STAMP ACT CONGRESS 13 (Am. Col. Oct. 19, 1765), *reprinted in id.* at 198.

[45] See Frederick, *supra* at 115-116.

[46] See THE DECLARATION OF INDEPENDENCE para. 30 (U.S. July 4, 1776), reprinted in 5 THE FOUNDERS' CONSTITUTION, *supra* at 199; Lee A. Strimbeck, *The Right to Petition*, 55 W. VA. L. REV. 275, 277 (1954).

[47] See 5 BERNARD SCHWARTZ, *supra* 1091-105.

[48] The vote was 10-41 in the House and 2-14 in the Senate. See *id.* at 1105, 1148.

[49] See 1 ANNALS OF CONG. 733-46 (Joseph Gales ed., 1789); 5 BERNARD SCHWARTZ, *supra* at 1093-94 (stating that representatives have a duty to inquire into the suggested measures contained in citizens' Petitions) (statement of Rep. Roger Sherman); *id.* at 1095-96

12

Congress's response to Petitions in the early years of the Republic also indicates that the original understanding of Petitioning **included a governmental duty to *respond*.** Congress viewed the receipt and serious consideration of every Petition as an important part of its duties.[50]

**Congress referred Petitions to committees[51] and even created committees to deal with particular types of Petitions.[52]** Ultimately, most Petitions resulted in either favorable legislation or an adverse committee report.[53]

Thus, throughout early Anglo-American history, general petitioning of the legislative and executive (as opposed to judicial petitioning) allowed the people a means of direct political participation that in turn demanded government response and promoted government accountability.

### The Ruling In *We The People Foundation V. United States* Did Not Conform With Fact and Truth As Also Demonstrated By The Opinions By Judges Kavanaugh and Rogers

---

(stating that Congress can never shut its ears to Petitions) (statement of Rep. Elbridge Gerry); *id.* at 1096 (arguing that the Right to Petition protects the Right to bring non-binding instructions to Congress's attention) (statement of Rep. James Madison).

[50] See STAFF OF HOUSE COMM. ON ENERGY AND COMMERCE, 99TH CONG., 2D SESS., PETITIONS, MEMORIALS AND OTHER DOCUMENTS SUBMITTED FOR THE CONSIDERATION OF CONGRESS, MARCH 4, 1789 TO DECEMBER 15, 1975, at 6-9 (Comm. Print 1986) (including a comment by the press that "the principal part of Congress's time has been taken up in the reading and referring Petitions" (quotation omitted)).

[51] See Stephen A. Higginson, Note, *A Short History of the Right to Petition the Government for the Redress of Grievances,* 96 YALE L. J. 142, at 156.

[52] See H.J., 25th Cong., 2d Sess. 647 (1838) (describing how petitions prompted the appointment of a select committee to consider legislation to abolish dueling).

[53] See Higginson, *supra* at 157.

13

In their opinions in *We The People,* both Judges Kavanaugh and Rogers acknowledged the Plaintiffs' HISTORICAL RECORD OF THE RIGHT TO PETITION GOVERNMENT FOR REDRESS OF GRIEVANCES.

However, Judge Kavanaugh, relying on definitions of "To petition" in a 1782 dictionary and a 1785 dictionary and a dubious reading of Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 NW. U. L. REV. 739, 766 (1999); *cf.* Norman B. Smith, *"Shall Make No Law Abridging . . .": An Analysis of the Neglected, but Nearly Absolute, Right of Petition*, 54 U. CIN. L. REV. 1153, 1190-91 (1986), concluded the meaning of the petition clause of the First Amendment is debatable and went on to say:

> "We need not resolve this debate, however, because we must follow the binding Supreme Court precedent. (citation omitted). And under that precedent, Executive and Legislative responses to and consideration of petitions are entrusted to the discretion of those Branches."

In other words, concluding the true meaning of the Petition Clause was somewhat controversial, to be decided another day by another Court, Judge Kavanaugh chose to defer to the inapplicable *Smith* and *Knight.*

In her separate, nine-page opinion, Judge Rogers wrote in relevant part:

> "As the court points out, we have no occasion to resolve the merits of appellants' historical argument, given the binding Supreme Court precedent in *Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 99 S. Ct. 1826, 60 L. Ed. 2d 360 (1979), and *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 104 S. Ct. 1058, 79 L. Ed. 2d 299 (1984). Op. at 9. **That precedent, however, does not refer to the historical evidence and we know from the briefs in *Knight* that the historical argument was not presented to the Supreme Court.**" (emphasis added). *We The People* at 145.

14

Judge Rogers' went on to say in part:

> "Appellants point to the long history of petitioning and the importance of the practice in England, the American Colonies, and the United States until the 1830's as suggesting that the right to petition was commonly understood at the time the First Amendment was proposed and ratified to include duties of consideration **and response.** *See* Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 HASTINGS CONST. L.Q. 15, 22-33 (1993); Norman B. Smith, '*Shall Make No Law Abridging . . . An Analysis of the Neglected, but Nearly Absolute, Right of Petition*, 54 U. CIN. L. REV. 1153, 1154-68, 1170-75 (1986). Based on the historical background of the Petition Clause, **most scholars agree that the right to petition includes a right to some sort of considered response.** James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 NW. U. L. REV. 899, 905 n.22 (1997); *see* David C. Frederick, *John Quincy Adams, Slavery, and the Right of Petition*, 9 LAW & HIST. L. REV. 113, 141 (1991) ; Spanbauer, *supra*, at 40-42; Stephen A. Higginson, Note, *A Short History of the Right to Petition*, 96 YALE L.J. 142, 155-56 (1986); Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions*, 106 HARV. L. REV. 1111, 1116-17, 1119-20 (1993); *see also* Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 YALE L.J. 1131, 1156 (1991) **(lending credence to Higginson's argument that the Petition Clause implies a duty to respond).** Even those who take a different view, based on a redefinition of the question and differences between English and American governments, acknowledge that there is **an emerging consensus of scholars' embracing appellants' interpretation of the right to petition.** *See* Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 NW. U. L. REV. 739, 756 (1999)." (emphasis added). *We The People* at 147.

The opinion by Judge Rogers is incongruous. It has the hallmarks of a dissent, admitting: 1) that the historical record of the Petition Clause, which was before her in *We The People*, was not before the Court in *Knight* or *Smith*; and 2) that there is an emerging consensus of scholars' embracing the appellants' interpretation of their rights under the Petition Clause, **including the right to a meaningful response.** However, Judge Rogers goes on to concur with Judge

Kavanaugh, agreeing to defer to, and be bound by, what can rightly be characterized as two totally inapplicable cases, *Smith* and *Knight*.

Thus, relying entirely on *Smith* and *Knight*, the *We The People* Court answered in the negative the two questions before the Court: 1) whether the government was obligated to respond to proper Petitions for Redress of violations of the Constitution and 2) whether People had the right of redress before taxes if the government refused to provide a meaningful response to the Petitions.

In effect, the *We The People* Court held there was no truth to the principle of law set forth in Blackstone, *Commentaries on the Laws of England* 23 and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162–163 (1803) that with every Right there is a remedy, and any Right that is not enforceable is not a Right.

By overlooking the historical evidence of the Petition Clause as well as Plaintiffs' private-non-government status and their claim of **law breaking** by government as opposed to **law making**, the *We The People* Court misapplied *Minnesota v. Knight*, 465 US 271 (1984) and its predecessor *Smith v. Arkansas State Highway Employees*, 441 U.S. 463 (1979).

In addition, unlike the 1450 Plaintiffs-Appellants in *We The People*, the petitioners in *Knight* and *Smith* were public sector employees whose speech and petition rights are limited to begin with. As the Supreme Court has declared, some rights of public sector employees, especially union activity, and speech and

petition regarding employment-related policy questions are limited so that the government agencies may perform their functions and because these employees often hold positions of trust in the Society. A citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Reaffirmed at *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011).

### The Ruling In *We The People* Did Not Conform With Fact and Truth As Also Demonstrated By *District of Columbia v. Heller* and *Borough of Duryea v. Guarnieri.*

In deferring to *We The People* (2007) and thus to *Knight* (1984) and *Smith* (1979), the Court is not only overlooking the historical record of the Petition Clause and the problematic reasoning of the *We The People* Court, the Court is also overlooking the subsequent decisions in *District of Columbia v. Heller 554 U.S. 570* (2008) and B*orough of Duryea v Guarnieri,* 564 U.S. 379, 386 (2011).

Notable is the fact Plaintiff Futia's reliance on the historical record of the petition clause comports with numerous principles set forth by the Supreme Court since the decision in 2007 by the D.C. Circuit in *We The People,* including those set forth in *District of Columbia* and *Guarnieri* as follows:

> "The First Amendment's Petition Clause states that 'Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances.' The reference to 'the right of the people' indicates that the Petition Clause was intended to codify a pre-existing, individual right, which means that **we must look to historical practice to determine its**

scope. See *District of Columbia* v. *Heller*, 554 U.S. 570, 579, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)." (emphasis added). *Guarnieri* at 403.

"[To determine] the proper scope and application of the Petition Clause … Some effort must be made to identify the historic and fundamental principles that led to the enumeration of the right to petition in the First Amendment, among other rights fundamental to liberty." *Guarnieri* at 394.

"The right to petition is in some sense the source of other fundamental rights, for **petitions have provided a vital means for citizens to … assert existing rights against the sovereign.**" (emphasis added). *Guarnieri* at 397.

"Rights of speech and petition are not identical. **Interpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the Right. A petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns.**" (emphasis added). *Guarnieri* at 388-389.

"**There is abundant historical evidence that Petitions were directed to the executive and legislative branches of government, not to the courts.**" *Guarnieri* at 402.

"Petition, as … an **essential safeguard of freedom**, is of ancient significance in English law and the Anglo-American legal tradition." (emphasis added). *Guarnieri* at 394.

## Stare Decisis Is Not An Absolute Doctrine

The Supreme Court has declared:

"It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Cohens v. Virginia*, 19 U.S. 264, 399-400 (March 5, 1821):

Plaintiff pleads with the Court to "completely investigate" the bearing on

this case of the principle "government is not obligated to respond to petitions for

redress" that emerged first in *Smith* and Knight and was carried over to *We The People Foundation, Inc., v United States,* 485 F.3d 140 (D.C. Cir. 2007).

**The underlying question of whether government is obligated to respond to proper First Amendment Petitions for Redress of its violations of the Constitution was admitted by the D.C. Court of Appeals in *We The People* as having NOT been resolved.**

If the factual evidence of the historical record was not before the Supreme Court in *Knight* and *Smith,* but was before the court in *We The People* and is before the court in the instant case, and the contemporary understanding as well as the principles of law laid down in *District of Columbia* and *Guarnieri* point overwhelmingly to an obligation on the part of government to respond to proper Petitions for Redress of Grievances, particularly to government's violation of individual, constitutionally-endowed rights, **then the decision in *We The People* is totally inappropriate, out of keeping with the accepted and usual course of Judicial proceedings and further evidence of Plaintiffs' constitutional injury.**

The opinion of this Court regarding the rights of the People and obligations of the Government under the Petition Clause would be of tremendous importance.

The history of the People's natural, unalienable Right to Petition the Government for Redress of Grievances shows the Right was recognized and meant to remain as one of the most, if not the most powerful of the checks and balances

embodied in America's Constitutional Republic, her political ideology – a

principal means, in addition to the electoral and judicial processes, for citizens to

hold their servant government accountable to the rule of law, from their federal and

state constitutions on down.

### Plaintiffs' Petition To The United States Exceeds Any Rational Standard Requiring A Response

Exhibit A annexed to Futia's August 15, 2022 Complaint includes an

Affidavit by Futia, sworn to on May 29, 2019, which includes Exhibits 1-47. Those

47 Exhibits present the highlights of the process of petitioning the government for

redress of its violation of specific provisions of the United States Constitution,

undertaken by Futia and other members of the We The People organization (WTP),

including the Constitution's tax provisions, from May of 1999 through the final

decision in *We The People v United States*. .

Exhibit B annexed to Futia's August 15, 2022 Complaint is an Affidavit by

Futia, sworn to on October 13, 2020, which speaks to his background, the work of

WTP's predecessor organizations from 1979-1997 in holding government

accountable to the rule of law, and his decision to become a founding member of

WTP's Board of Directors in 1997.

Exhibit C annexed to Futia's August 15, 2022 Complaint is an Affidavit by

Futia, sworn to on October 13, 2020, which includes as Exhibit 1, a copy of the

ARTICLES OF FREEDOM, THE WORKS OF THE CONTINENTAL

CONGRESS 2009. Continental Congress 2009, an eleven day event with 121 delegates elected from 48 States, was an integral part of WTP's and Futia's overall petitioning process, **undertaken as an appropriate next step following the final decision in the *We The People* case** . On April 19, 2020, the ARTICLES OF FREEDOM were served on each of the 50 State Governors and members of the U.S. Congress in each of the 50 States. Futia's **decision in 2014 to finally stop filing tax returns followed: 1) the government's refusal to respond to the petitions for redress contained in the ARTICLES OF FREEDOM; and 2) the Supreme Court's decision in 2011 in *Borough of Duryea* v. *Guarnieri*, 564 U.S. 379.**

Exhibit E annexed to Futia's August 15, 2022 Complaint is Futia's response to IRS's notice of collection letter. It includes: 1) a copy of Futia's March 16, 2022 letter to government officials in the Town of North Castle and Westchester County that detailed much of the decades-long petitioning process that led to his decision to stop paying the federal income tax; and 2) WTP's April 2001 submission to the U.S. Senate Finance Committee as part of WTP's petition process; and 3) another copy of Futia's 5/29/19 Affidavit, highlighting the government's oft-repeated refusal to respond to the Petition for Redress of violations of the constitution's tax clauses.

WTP's and thus Futia's overall, 23-year Petition process for Redress of the government's violation of the Constitution's tax clauses exceeds any rational standard for a Petition requiring a **meaningful response** in that it:

1. provided legal Notice seeking substantive Redress to cure the infringement of a right leading to civil legal liability;
2. was serious and documented, not frivolous;
3. contained no falsehoods;
4. was not absent probable cause;
5. had the necessary quality of a dispute;
6. came from citizen  outside the formal political culture and involved a legal principle not political talk;
7. was punctilious and dignified, containing both a "direction" and a "prayer for relief;
8. addressed a public, collective grievance with widespread participation and consequences;
9. was an instrument of deliberation not agitation.
10. provided legal notice seeking substantive Redress to cure the infringement of a right under the Constitution and laws pursuant thereto.

## Irreparable Harm

As Judge Kavanaugh wrote in deciding *We The People*:

"For purposes of this appeal, we take the allegations in the complaint as true. According to plaintiffs, they have engaged **since 1999** in "a nationwide effort to get the government to answer specific questions" regarding what plaintiffs view as the Government's "violation of the taxing clauses of the Constitution" and "violation of the war powers, money and `privacy' clauses of the Constitution." Joint Appendix ("J.A.") 80 (Am. Compl. ¶ 3). Plaintiffs submitted petitions with extensive lists of inquiries to various government agencies. On March 16, 2002, for example, plaintiffs submitted a petition with hundreds of inquiries regarding the tax code to a Member of Congress and to various parts of the Executive Branch, including the Department of Justice and the Department of the Treasury. On November 8, 2002, plaintiffs presented four petitions to each Member of Congress. Those petitions concerned the Government's war powers, privacy issues, the Federal Reserve System, and the tax code. On May 10, 2004, plaintiffs submitted a petition regarding similar issues to the Executive Branch, including the Department of

Justice and the Department of the Treasury. (emphasis added).

"Plaintiffs contend that the Legislative and Executive Branches have responded to the petitions with 'total silence and a lack of acknowledgment.'"

Plaintiff Futia has made a strong showing as to the likelihood of success on the merits. Irreparable constitutional injury will continue if the injunction does not issue. The balance of harm favors issuing the requested injunction as Plaintiff's harm far outweighs any harm or damage the injunction may cause the United States. The issuance of the injunction would be in the public interest.

The *We The People* Court's decision does not withstand constitutional scrutiny under the Constitution's Petition Clause and Due Process Clauses. For instance, petitioning the government **for Redress** of violations of the Constitution and exercising the right of **redress before taxes** in the event of government's refusal to provide a meaningful response is a fundamental Right and the decision by the *We The People* Court impermissibly infringes upon that Right.

Futia will likely succeed in establishing that the United States failure to respond to his Petitions since 1999 impermissibly violates his constitutional Rights, favoring this Court's grant of the requested injunction.

Under the facts and circumstances of this case, the deprivation of Futia's constitutional Rights, even for minimal periods of time, constitutes irreparable harm. "[T]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." See *New York Times Co. v. United States*, 403 U.S. 713 (1971), and *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The threatened injury to Futia by the continued refusal of the government to respond to his petition(s), which silence is unconstitutional, outweighs any damage an injunction may cause the United States.

Finally, the issuance of the requested injunction would not be adverse to the public interest as it is always in the public interest to prevent the violation of a party's constitutional rights.

## CONCLUSION

Plaintiff Futia is inherently deserving of and entitled to preliminary injunctive relief.

*We The People, et al., v United States*, 485 F.3d 140 (2007) is not preclusive, especially in view of Futia's historical, entirely proper petitioning process, the historical record of the right to petition and the principles of law laid down in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Borough of Duryea v Guarnieri*, 564 U.S.379 (2011).

Beginning in May of 1999 and continuing well beyond the decision by the *We The People* Court, Futia, together with tens of thousands of other ordinary Americans, humbly sought to exercise their right to hold the Government accountable by repeatedly petitioning the Government for redress of what they

24

perceived to be violations of the Constitution's prohibition against undeclared

wars,[54] unreasonable invasions of privacy,[55] un-enumerated powers,[56] and direct,

un-apportioned taxes.[57] Their repeated petitions were answered only with repeated

injury.

The petitions quoted the Constitution and laws, provided factual evidence of

the violations and respectfully, imaginatively and persistently asked the

Government of the United States to respond. The Government did not respond,

except for an insincere response meant only to end a hunger fast.[58]

---

[54] Public Law 107-243 (Iraq Resolution): violation of Art. I, Section 8, Clause11.

[55] Public Law 107-56 (Patriot Act): violation of Fourth Amendment.

[56] Public Law 63-43 (Federal Reserve Act): an un-enumerated power.

[57] The direct, un-apportioned tax on labor: a violation of Art I, Sec 9, Cl 4 and Art I, Sec 2, Cl 3.

[58] On July 1, 2001, WTP's Chairman, Robert Schulz, in his individual capacity, embarked on a personal hunger fast until the Government agreed to meet in a public, congressional-style hearing on Capitol Hill to discuss the constitutionality of the direct, un-apportioned tax on labor. On July 20, 2001, with the assistance of Rep. Roscoe Bartlett, the IRS and DOJ agreed to such a congressional-style hearing. The agreed-upon date of the hearing, to be chaired by Rep. Henry Hyde, was September 22-23, 2001. Schulz ended his 20-day hunger fast. The organization hired three licensed and practicing constitutional attorneys to prepare the questions to be asked of the Government at the agreed-upon hearing. However, the events of September 11, 2001 led to the cancellation of the congressional-style hearing on Capitol Hill. The organization organized a two-day hearing at the Washington Marriott on February 22-23, 2002, which was public and live-streamed on the Internet, where numerous tax-professionals, including a former IRS Counsel, former IRS Agents and practicing attorneys, CPAs and tax law researchers answered the questions, supporting their answers with factual evidence which was displayed on a large screen for the full audience to see. The New York Times covered the event, describing it in an article published the next day as a "multi-media, technological breakthrough." Following the hearing, Rep. Bartlett mailed a copy of the questions to the DOJ, requesting answers. In April of 2002, DOJ sent a letter advising Rep. Bartlett that the Government would not be responding to the questions, and that for four years the DOJ and the IRS had been attempting, without success, to get Congress to put into

This case is about Futia's fundamental petition and due process rights -- his right to petition the government for redress of its violation of the constitution and his right of redress before taxes without retaliation by the government should the government refuse to provide a meaningful response to his petitions.

Respectfully submitted.

Dated: September 30, 2022

ANTHONY J. FUTIA, Jr., pro se
34 Custis Ave
North White Plains, NY 10603
(914) 906-7138
Futia2@optonline.net

Motion for Reconsideration is Denied.  Plaintiff has failed to establish that the Court overlooked any binding authority or fact or that its decision will result in a miscarriage of justice.  It may be that Plaintiff disagrees with the DC Circuit's decision in We The People Foundation v. United States, 485 F.3d 140 (D.C. Cir. 2007), but that does not merit reconsideration by this Court, which found that case to be persuasive. Moreover, Plaintiff has failed to address the procedural infirmities in this case, which independently undercut his claim to a likelihood of success on the merits.  To be clear, to date, the Court has not ruled on the yet-to-be-filed Motion to Dismiss, but has only denied Plaintiff's motion for injunctive relief.

The Clerk is directed to terminate the pending motion (Dkt. # 9.)

So Ordered.

10/18/22

law that the issues addressed by the questions were frivolous. Following the hearing at the Marriott, the organization delivered a complete video and transcribed record of the hearing to the Executive and various legislative committees in Congress, requesting a response. Each and every member of Congress received a complete video and transcribed record from one or more of their constituents, requesting a response. **There was no response.**

26